La Jueza Asociada Señora Pabón Charneco
emitió la opinión del Tribunal.
Hoy este Tribunal está llamado a expresarse en cuanto a la constitucionalidad de dos piezas legislativas que dis-ponen celebrar un referéndum el 19 de agosto de 2012. En este se propone al Pueblo enmendar las Sees. 2, 3, 4, y 7 del *5 Art. Ill de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, con el fin de reducir el número de miembros de los Cuer-pos Legislativos. ([1])
El caso de autos coloca ante nuestra consideración diversas y complejas interrogantes de índole constitucional. Los eminentes intereses públicos involucrados, los argu-mentos constitucionales sustanciales presentados por am-bas partes y la proximidad de la fecha en la cual se cele-brará el referéndum que le propondrá al Pueblo enmendar su lex superior, obligan a este Tribunal a hacer uso de la razón principal por la cual fue creado: interpretar la Cons-titución de Puerto Rico y pautar Derecho para el correcto y adecuado funcionamiento del ordenamiento constitucional. No obstante, nuestra encomienda en este caso se limita a interpretar si las propuestas de enmienda y el proceso me-diante el cual se aprobaron cumplen con los requisitos que impone el Art. VII de la Constitución, L.P.R.A. Tomo 1. Por ende, nuestra labor no se extiende a pasar juicio en cuanto a las bondades de las enmiendas propuestas.
Antes de adentrarnos a resolver las controversias que presenta el caso de autos, pasemos a exponer los hechos que lo generaron.
I
El 13 de abril de 2010 se presentó la Resolución Concu-rrente del Senado Núm. 35, 16ta Asamblea Legislativa, 3ra Sesión Ordinaria (en adelante Res. Concurrente Núm. 35), la cual tenía como fin proponer al Pueblo una serie de *6 enmiendas al Art. Ill de la Constitución de Puerto Rico, L.P.R.A., Tomo 1.
Las enmiendas propuestas en la referida Resolución Concurrente se pueden resumir de la manera siguiente: reducir los escaños del Senado de Puerto Rico de veinti-siete (27) a diecisiete (17); reducir los escaños de la Cá-mara de Representantes de cincuenta y uno (51) a treinta y nueve (39); aumentar los distritos senatoriales de ocho (8) a once (11); reducir los distritos representativos de cua-renta (40) a treinta y tres (33); reducir los distritos repre-sentativos en cada distrito senatorial de cinco (5) a tres (3); reducir la cantidad de senadores de cada distrito senatorial de dos (2) a uno (1), y reducir la cantidad de escaños que se añadirían en caso de que se activaran la disposicio-nes de la See. 7 del Art. III de la Constitución, supra, en el Senado de nueve (9) a seis (6) y en la Cámara de Representantes de diecisiete (17) a trece (13). De aprobarse las en-miendas, estas entrarían en vigor a partir de las elecciones generales de 2016. Finalmente, la Res. Concurrente Núm. 35 facultó al Gobernador de Puerto Rico para convocar a la Junta Constitucional Revisora de Distritos Senatoriales y Legislativos para configurar los nuevos distritos, utili-zando la información del censo del 2010.
La Res. Concurrente Núm. 35 se aprobó en la Cámara de Representantes de Puerto Rico el 28 de septiembre de 2011. La votación en ese cuerpo legislativo fue de treinta y siete (37) votos a favor, dieciséis (16) en contra y un (1) representante ausente. Posteriormente, el 10 de octubre de 2011, el Senado de Puerto Rico aprobó la Res. Concurrente Núm. 35 con una votación final de veinte (20) votos a favor, ocho (8) en contra, un (1) senador ausente y dos (2) escaños vacantes.
Así las cosas, el 9 de enero de 2012, el Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, firmó la Ley Núm. 12-2012, conocida como Ley Habilitadora del Refe-réndum sobre Reforma Legislativa de 2012. Este estatuto *7 establece la fecha de celebración del referéndum y ordena a la Comisión Estatal de Elecciones (en adelante C.E.E.) a anunciar su celebración con no menos de noventa (90) días de antelación. Efectivamente, el 18 de mayo de 2012 se publicó la proclama que anuncia la celebración del referén-dum en diversos medios periodísticos.
Posteriormente, el 23 de mayo de 2012 el Partido Inde-pendentista Puertorriqueño (en adelante P.I.P.) presentó una demanda en el Tribunal de Primera Instancia, Sala Superior de San Juan, en la cual solicitó que se declarara inconstitucional tanto la Res. Concurrente Núm. 35, como la Ley Núm. 12-2012. A esos efectos, peticionó que el foro de instancia emitiera una orden de interdicto preliminar y una Sentencia de injunction permanente que le ordenara a la C.E.E. y a su Presidente, Hon. Héctor Conty Pérez, de-sistir de poner en vigor la Res. Concurrente Núm. 35 y la Ley Núm. 12.
Inter alia, y en extrema síntesis, el P.I.P. alegó que la Res. Concurrente Núm. 35 no fue aprobada por el número de dos terceras (2/3) partes de todos los miembros que com-ponen la totalidad de los miembros del Senado de Puerto Rico y que el referéndum que ha de celebrarse el próximo 19 de agosto contiene nueve (9) propuestas de enmiendas constitucionales, en contravención del Art. VII de la Cons-titución de Puerto Rico, supra, y la decisión de este Tribunal en Berríos Martínez v. Gobernador II, 137 D.P.R. 195 (1994).
Por interpretarse que la Demanda presentada por el P.I.P. era de naturaleza electoral al amparo del Código Electoral de Puerto Rico para el Siglo XXI, el caso fue asig-nado a la Sala de la Jueza Superior, Hon. Georgina Candal Seguróla. Esta celebró una vista el 30 de mayo de 2012, en la cual el Gobierno de Puerto Rico (en adelante el peticio-nario) solicitó que el caso fuera asignado a otra sala por entender que no era de naturaleza electoral. Esta solicitud fue denegada por el foro de instancia.
*8 Acto seguido, el peticionario argumentó que el caso de autos no era justiciable por faltar partes indispensables, porque el P.I.P. no ostentaba legitimación activa, porque se violaba la Doctrina de Separación de Poderes si se procedía con la demanda y porque hubo una violación a la Doctrina de Incuria por parte del P.I.P. Todo ello fue denegado en sala por el Tribunal de Primera Instancia. Esta denegación posteriormente fue consignada en una minuta-resolución notificada el 4 de junio de 2012.
Aún insatisfecho, el peticionario presentó una Moción de Desestimación en la cual nuevamente esbozó los argu-mentos por los cuales entendía el caso no era justiciable. Oportunamente, el P.I.P. presentó una Oposición a la Mo-ción de Desestimación. El foro de instancia le concedió hasta el 18 de junio de 2012 al peticionario para que repli-cara a esa oposición.
Inconforme con el proceder ante el Tribunal de Primera Instancia, el 14 de junio de 2012 el peticionario presentó un Recurso de Certificación intrajurisdiccional en el cual argumentó que, ante los eminentes intereses públicos in-volucrados en el caso de autos y la proximidad de la fecha acordada para la celebración del referéndum en controver-sia, ameritaba que fuera este Tribunal el que resolviera el asunto en primera instancia.
Examinada la certificación intrajurisdiccional, coincidi-mos con el peticionario y el 15 de junio de 2012 acordamos certificar. Oportunamente, las partes presentaron sus ale-gatos y procedimos a convocarlas a una Vista Oral. Cele-brada la Vista el 27 de junio de 2012, solo resta que este Tribunal ejerza su función constitucional.([2])
*9 II

Mecanismo de certificación intrajurisdiccional

Nuestro ordenamiento jurídico concede jurisdicción a este Tribunal para, a través de un auto de certificación intrajurisdiccional, que intervenga en casos pendientes ante los tribunales de inferior jerarquía cuando “se planteen cuestiones noveles de derecho, o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial” al amparo de la Constitución de Puerto Rico o de la Constitución de Estados Unidos. 4 L.P.R.A. sec. 24s(e). La Regla 23 del Reglamento de este Tribunal, 4 L.P.R.A. Ap. XXI-B, regula la manera como ha de utilizarse este poder jurisdiccional. In re Reglamento Tribunal Supremo, 183 D.P.R. 386, 454 (2011).
Cónsono con estas disposiciones, el recurso de certifica-ción intrajurisdiccional ha sido utilizado por este Tribunal “para atender asuntos que requieren urgente solución, ya sea porque se afecta la administración de la justicia o por-que el asunto es de tal importancia que exige una pronta atención”. U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253, 272—273 (2010). Hemos hecho uso de este mecanismo en múltiples ocasiones, particularmente en casos que invo-lucran controversias de índole electoral. Véanse: McClintock v. Rivera Schatz, 171 D.P.R. 584 (2007); Suárez v. C.E.E. I, 163 D.P.R. 347 (2004) (per curiam).
No hay duda de que ante los eminentes intereses públi-cos expuestos en el caso de marras es meritorio utilizar el mecanismo de certificación intrajurisdiccional. Así, y al igual que en otras ocasiones, al adjudicar las controversias plasmadas en el caso de autos “partimos de la premisa de que este Tribunal tiene la obligación constitucional de resolver una controversia como la de autos, en la que está involucrado el derecho fundamental al sufragio a la luz de un ordenamiento totalmente estatal”. (Énfasis suplido). Suárez v. C.E.E. I, supra, pág. 353.
*10 Estamos a menos de dos (2) meses de la celebración del referéndum que generó la controversia del caso de autos. Las campañas de los sectores a favor y en contra de las propuestas enmiendas ya han comenzado. Es la obligación constitucional de este Tribunal resolver de una vez y por todas el caso de epígrafe para dejar claro si el ejercicio electoral de 19 de agosto de 2012 puede llevarse a cabo o si, a contrario sensu, el procedimiento para su aprobación es-tuvo plagado de vicios constitucionales que impiden su celebración.
III

Asuntos presentados

El caso de autos presenta ante la consideración de este Foro una compleja amalgama de controversias constitu-cionales. En aras de delimitar los temas que debemos con-siderar, estructuraremos la Opinión de la manera siguiente.
Ab initio, debemos considerar si el caso de autos es justiciable. Por ende, debemos determinar si el recurrido P.I.P. ostenta legitimación activa para litigar este caso. De contestar afirmativamente esa interrogante, debemos en-tonces resolver si el P.I.P. violó la Doctrina de Incuria al esperar siete (7) meses después de la aprobación de la Res. Concurrente Núm. 35 y cuatro (4) meses después de la aprobación de la Ley Núm. 12 para presentar la Demanda de epígrafe. De resolver en la negativa, debemos conside-rar entonces los asuntos constitucionales medulares que nos presentan las partes, a saber: (1) si la Res. Concu-rrente Núm. 35 fue, en efecto, aprobada por dos terceras (2/s) partes de la totalidad de los miembros que componen el Senado de Puerto Rico; (2) si la proposición de enmienda de Reforma Legislativa contiene más de tres (3) propuestas de enmienda en contravención de la Sec. 1 del Art. VII de la Constitución, L.P.R.A., Tomo 1; (3) si la Res. Concu- *11 rrente Núm. 35 es inconstitucional por facultar al Gober-nador de Puerto Rico a convocar la Junta Constitucional Revisora de Distritos Senatoriales y Representativos en medio de una década, y (4) si padecen de algún vicio cons-titucional los anuncios publicados que anuncian el referén-dum de 19 de agosto de 2012.
Debidamente delimitados los asuntos hoy ante nosotros, pasamos a resolver.
IV

Legitimación activa del P.I.P.

Según mencionamos, antes de pasar a considerar de lleno las controversias constitucionales presentadas en el caso de autos, debemos determinar si el recurrido P.I.P. ostenta legitimación activa para sustentar este pleito.
Es un principio reconocido en nuestro ordenamiento que los tribunales solo pueden ejercer su función judicial ante la presencia de casos y controversias reales. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Este principio de Derecho exige que los pleitos que se presenten ante los tribunales sean justiciables. En varias ocasiones hemos reafirmado que uno de los requisitos de justiciabilidad necesarios para dar paso al ejercicio de la función judicial es que los litigantes ostenten legitimación activa. Lozada Sánchez et al. v. JCA, 184 D.P.R. 898 (2012); Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R. 563 (2010); Crespo v. Cintrón, 159 D.P.R. 290 (2003). Este requisito permite a los tribunales asegurarse que las partes que promueven un pleito tienen un interés genuino en la. resolución de la controversia. A su vez, ello garantiza que las partes defenderán sus posturas de forma vigorosa y todos los asuntos pertinentes serán colocados ante la consideración del tribunal. Sánchez et al. v. Srio. de Justicia et al., 157 D.P.R. 360, 371 (2002).
*12 Para cumplir con el requisito de legitimación activa, una parte debe demostrar que “(1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto e hipotético; (3) existe una relación causal razonable entre la acción que se ejercita y el daño alegado, y (4) la causa de acción debe surgir al amparo de la Constitución o de alguna ley”. Fund. Surfrider y otros v. A.R.Pe., supra, pág. 572.
Por su parte, en el caso de asociaciones o grupos, hemos resuelto que estas tienen legitimación activa para vindicar los daños sufridos por la entidad. Col. Opticos de P.R. v. Vani Visual Center, 124 D.P.R. 559 (1989). Además, la asociación puede comparecer a los tribunales a defender los intereses de sus miembros aunque esta no haya sufrido daños propios. En ese escenario, hemos establecido que para demandar a nombre de sus miembros la asociación “tiene que demostrar: (1) el miembro tiene legitimación activa para demandar a nombre propio; (2) los intereses que se pretenden proteger están relacionados con los objetivos de la organización, y (3) la reclamación y el remedio solicitado no requieren participación individual”. Fund. Surfrider y otros v. A.R.Pe., supra, pág. 573.
En el caso de autos, el Gobierno de Puerto Rico cuestiona la legitimación activa del P.I.P. Entendemos que este último ha cumplido con los requisitos necesarios enumera-dos para conferir legitimación activa, ya que puede repre-sentar de manera efectiva los daños sufridos por los miem-bros de su colectividad.
Ciertamente, los electores del P.I.P. tienen un derecho a que no se les obligue a votar por más de tres (3) propuestas de enmiendas constitucionales y a que se les presenten de manera separada. Ello representa un daño real, claro y concreto que puede ser representado por el P.I.P. a nombre de sus electores. Definitivamente, los intereses que pre-tende proteger el P.I.P. son afines a los objetivos de este como organización política. Además, la participación de los *13 electores en su carácter individual en el pleito no es nece-saria, ya que el P.I.P. es un partido de larga tradición electoral en Puerto Rico, altamente capacitado para represen-tar los intereses de sus miembros y capaz de colocar ante la consideración del Tribunal todos los asuntos pertinentes. Por ende, no le asiste la razón al Gobierno de Puerto Rico; el caso es justiciable.([3])
V

Doctrina de Incuria

Por otro lado, el peticionario alega que el caso de autos no es justiciable debido a que el P.I.P. violó la Doctrina de Incuria al dejar pasar siete (7) meses desde la aprobación de la Res. Concurrente Núm. 35 y cuatro (4) meses desde la aprobación de la Ley Núm. 12, antes de presentar la Demanda de epígrafe.
Este Tribunal ha definido la Doctrina de Incuria como la “dejadez o negligencia en el reclamo de un derecho, los cuales en conjunto con el transcurso del tiempo y otras circunstancias que causan perjuicio a la parte adversa, opera como un impedimento en una corte de equidad”. Aponte v. Srio. de Hacienda, E.LA., 125 D.P.R. 610, 618 (1990). Su fin es evitar premiar a una parte que se cruza de brazos, aim conociendo sobre la existencia de su derecho si con ello se causa perjuicio a la otra parte o se lesionan importantes intereses públicos o privados.
Ahora bien, esta doctrina no opera por el mero paso del tiempo. Colón Torres v. A.A.A., 143 D.P.R. 119, 125 *14 (1997) (per curiam). Hemos establecido que los tribunales tienen un deber de considerar otros factores antes de des-estimar un caso bajo la Doctrina de Incuria. Pérez, Pellot v. J.A.S.A.P., 139 D.P.R. 588, 599-600 (1995). Entre estos factores debe considerarse la justificación de la demora en que se incurrió, el peijuicio que esta conlleva y el efecto sobre los intereses privados o públicos involucrados en el asunto. Rivera v. Depto. de Servicios Sociales, 132 D.P.R. 240, 247 (1990).
Aunque se trata de un remedio en equidad, y a pesar de que nuestro ordenamiento es eminentemente de tradición civilista, en nuestra jurisdicción “hemos aplicado la Doctrina de Incuria con relación a remedios extraordinarios dispuestos por nuestro ordenamiento que han sido adoptados del Derecho angloamericano como por ejemplo el injunction, el mandamus y el certiorari”. Aponte v. Srio. de Hacienda, E.L.A., supra, pág. 618. No obstante, hemos sido enfáticos en que, cuando se trate de acciones civiles ordinarias cuyo término prescriptivo esté claramente dispuesto por ley, la defensa de incuria no procede. Íd.([4])
No podemos pasar por alto que la acción del P.I.P. le-vanta algunas sospechas. Después de todo, la dama de la justicia es ciega, no ingenua. Resulta altamente revelador el que el P.I.P. esperara para presentar su Demanda hasta justo después de vencer el término de tres (3) meses que la Constitución provee para anunciarle al Pueblo propuestas de enmiendas constitucionales.([5]) Durante siete (7) meses el P.I.P. supo de la enmienda constitucional propuesta y de todas sus implicaciones, y también por cuatro (4) meses de *15 las disposiciones de la Ley Núm. 12. Aun así, no actuó hasta vencido el término de tres (3) meses para anunciar las enmiendas constitucionales. Ello deja mucho que desear. Como hemos dicho recientemente, “[n]o podemos permitir que las normas procesales de nuestro ordena-miento se interpreten de forma tal que se convierta el pro-ceso judicial en un campo minado, en donde las partes se enfrentan en un juego para ver quién cae primero en una trampa”. Colón Rivera v. Wyeth Pharm., 184 D.P.R. 184, 194 esc. 3 (2012). Ello aplica aun más en casos que involucren cuestiones constitucionales.
Un referéndum que propone al Pueblo una serie de en-miendas a su lex superior es un evento complejo, sensitivo y altamente regulado. Conlleva el desembolso de una can-tidad sustancial de fondos del erario,([6]) la coordinación de varias campañas y un proceso organizativo complicado de la C.E.E. para llevar a cabo el evento correctamente y edu-car al Pueblo en cuanto a las propuestas de enmienda. Es cuestionable que una parte espere tanto tiempo para pre-sentar mía acción judicial para impugnarlo, particular-mente cuando conocía de todos sus pormenores con mucho tiempo de anticipación y cuando se trata de un partido político de largo historial con amplio conocimiento de los asuntos constitucionales.
No obstante esta dilación innecesaria y sospechosa por parte del P.I.P., entendemos que la Defensa de Incuria no aplica en el caso de autos. Primero, se trata de un cuestio-namiento al proceso de enmienda a la Constitución, lo cual es un procedimiento de alto interés público y en el cual, para el bien del ordenamiento, conviene que se despejen dudas sobre su alegada inconstitucionalidad. Segundo, aunque la acción para impugnar un proceso de enmienda *16 constitucional no tiene un término específico establecido por ley, por lo cual podría aplicar la Doctrina de Incuria, entendemos que en el caso de marras hay tiempo suficiente para resolver las controversias constitucionales presentadas. Y es que aun no se han impreso las papeletas y las campañas tanto a favor como en contra de las en-miendas se encuentran en sus etapas iniciales. Todo ello pesa a favor de resolver el caso de autos y no aplicar la Defensa de Incuria. No obstante, enfatizamos en que este tipo de acciones pueden estar sujetas a la Doctrina de In-curia y que es impropio de una parte cruzarse de brazos hasta el último momento para instar su acción constitucional. Ello desluce nuestro ordenamiento y tiene el efecto de presentar a las partes como protagonistas de un juego en el cual cada uno intenta hacer caer al otro en una trampa. Nuestro documento constitucional merece mayor respeto.
VI

El procedimiento para enmendar la Constitución de Puerto Rico

Resuelto que el caso de autos es justiciable, pasamos a discutir las controversias constitucionales ante nuestra consideración.
El Estado es un ente abstracto cuya definición ha sido objeto de debates constantes a través de la existencia humana. Podría decirse que la razón de ser de la disciplina de la ciencia política es precisamente buscar una definición de este concepto. La idea de una Constitución escrita como mecanismo de creación de una estructura estatal hizo su aparición por primera vez en el siglo XVIII. J.M. Kelly, A Short History of Western Legal Theory, Oxford, Ed. Clarendon Press, 1992, págs. 277-282. Previo a ese siglo, la creación de un Estado sencillamente se justificaba mediante la tradición y las prácticas y costumbres de tiempos *17 inmemorables. Véase L.D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review, Nueva York, Oxford University Press, 2004, págs. 9-34.([7])
En la época política contemporánea, el sistema constitu-cionalista regularmente se sustenta en la existencia de un documento constitucional que representa la lex superior del ordenamiento jurídico. Hoy es aceptado que las consti-tuciones son “un conjunto de normas fundamentales que establece [n] las bases jurídicas de la ordenación político-social de un pueblo, protegiendo los derechos y la dignidad esencial de la posición de los ciudadanos, estableciendo las instituciones de gobierno y encauzando los procesos políticos”. Escuela de Administración Pública U.P.R., La nueva Constitución de Puerto Rico, San Juan, Ed. U.P.R., 2005, pág. 122.
Es necesario entonces que ante la trascendental impor-tancia de un documento constitucional, el procedimiento para enmendarlo sea particularmente detallado y definido. Como estableció la Escuela de Administración Pública de la U.P.R. en su reporte a la Convención Constituyente,
... una constitución democrática, fuerte y estable es aquella en la cual siempre hay un alto grado de congruencia entre los principios fundamentales que encierra y el concepto que tiene el público en general sobre lo que deben ser esos principios. Cuando la constitución refleja cambios en actitudes sociales básicas, es una fuerza viviente que une a la sociedad y pro-mueve su desarrollo normal. Cuando no refleja tales cambios, es una fuerza destructora que constituye un obstáculo para el desarrollo saludable y produce la desintegración de la socie-dad misma. La nueva Constitución de Puerto Rico, op. cit., pág. 520.
*18 Es por ello que para evitar convertirse en un folleto es-tático que refleje meramente las concepciones sociales de un momento dado, y ante la imposibilidad de que los tribu-nales o la Asamblea Legislativa enmienden motu proprio su texto, los documentos constitucionales deben contener una cláusula de enmienda que “más que ninguna otra, da vida a la constitución”. La nueva Constitución de Puerto Rico, op. cit, pág. 520. No obstante, y por su evidente im-portancia, las Constituciones no pueden ser enmendadas como si fueran cualquier otro estatuto.
Por ende, no hay duda de que el poder para enmendar una Constitución “debe ejercerse de forma que el ordenamiento constitucional pueda mantener su coherencia, libre de los caprichos momentáneos y arbitrarios de las mayorías. Por tal razón, es necesario que una constitución tenga un procedimiento específico que limite el proceso mediante el cual se revisa; la naturaleza de este procedimiento debe distinguir la Constitución de las leyes ordinarias”. Berríos Martínez v. Gobernador II, supra, págs. 210-211.
Así, es importante que los mecanismos que provea la propia Constitución sean lo suficientemente detallados para cumplir dos (2) propósitos. Primero, encontrar un balance adecuado entre permitir enmiendas al texto consti-tucional para atemperarlo a los tiempos sin que sea tan fácil como para que las enmiendas sean demasiado constantes. Segundo, garantizar que las enmiendas verda-deramente se encuentren respaldadas por el consenso general e informado de los ciudadanos.
Con ello en mente, los padres de nuestra Constitución establecieron un procedimiento expreso y detallado de enmienda. El Art. VII de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, establece dos (2) mecanismos posibles para enmendar el documento constitucional. Por su pertinencia, citamos in extenso de la Sec. 1 de la referida disposición constitucional:
*19 La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara. Toda proposición de enmienda se someterá a los electores capacitados en refe-réndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. Cada pro-posición de enmienda deberá votarse separadamente y en nin-gún caso se podrá someter más de tres proposiciones de en-mienda en un mismo referéndum. Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. Aprobada una proposi-ción de enmienda, deberá publicarse con tres meses de ante-lación, por lo menos, a la fecha del referéndum. (Énfasis suplido). Sec. 1, Art. VII, Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 442.
Como puede apreciarse, este primer mecanismo de refe-réndum presenta dos (2) filtros para garantizar el consenso general necesario para enmendar la Constitución. De en-trada se requiere la aprobación de dos terceras (2/.s) partes de los miembros de cada cuerpo legislativo para proponer las enmiendas. Posteriormente, se requiere la aprobación por parte del electorado.
La disposición también contiene mecanismos de protec-ción para el Pueblo. Si el referéndum se quiere celebrar el mismo día de las elecciones generales, el número de votos a favor de las enmiendas en los Cuerpos Legislativos au-menta a tres cuartas ifk) partes. Además, no se le pueden presentar al Pueblo más de tres (3) proposiciones de en-mienda y se le debe dar la oportunidad de votar por cada una de forma separada (principio de separabilidad).
Por último, la See. 2 del Art. VII de la Constitución pro-vee un segundo método de enmienda constitucional. Espe-cíficamente, dispone:
La Asamblea Legislativa podrá, mediante resolución concu-rrente aprobada por dos terceras partes del número total de *20 los miembros de que se compone cada cámara, consultar a los electores capacitados si desean que se convoque a una conven-ción constituyente para hacer una revisión de esta Constitución. La consulta se hará mediante referéndum que se celebrará al mismo tiempo que la elección general; y si se de-posita a favor de la revisión una mayoría de los votos emitidos sobre el particular, se procederá a la revisión en Convención Constituyente elegida en la forma que se disponga por ley. Toda revisión de esta Constitución deberá someterse a los elec-tores capacitados en referéndum especial para su aprobación o rechazo por mayoría de los votos que se emitan. (Enfasis suplido). See. 2, Art. VII, Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 443.
Como vemos, este segundo mecanismo para proponer enmiendas a la Constitución también requiere el aval de dos terceras (2h) partes de los miembros de los Cuerpos Legislativos. De aprobarse, se le consultaría al Pueblo si desea convocar una Convención Constituyente, la cual pro-cedería a hacer una revisión estructural de todo el docu-mento constitucional.
Finalmente, la See. 3 del Art. VIII, L.P.R.A., Tomo 1, establece dos (2) limitaciones absolutas a los procedimientos de enmienda. Primero, ninguna enmienda puede alterar la forma republicana de gobierno establecida en la Constitución y, segundo, la Carta de Derechos contenida en el Art. II del documento no puede ser abolida. L.P.R.A., Tomo 1.
Surge del historial de la Convención Constituyente que los constituyentes tuvieron ante sí la opción de adoptar diversos métodos para disponer sobre enmiendas a la Constitución. Específicamente se rechazaron dos (2) métodos alternativos de reforma constitucional: las enmiendas por iniciativa popular y las sumisiones periódicas y auto-máticas para convocar una Convención Constituyente. J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. U.P.R., 1982, T. III, pág. 259.
Según Trías Monge, el método de enmienda por inicia-tiva popular se rechazó “por la razón de que la delegación *21 mayoritaria ... estaba firmemente en contra de todo mé-todo de democracia directa, por haber tal recurso conver-tido en ocasiones las constituciones afectadas en fácil presa de grupos de presión”. Trías Monge, op. cit., pág. 259. El rechazo a ese método de enmienda constitucional quedó claro con nuestra decisión en Córdova y otros v. Cámara Representantes, 171 D.P.R. 789, 806 (2007).
En cuanto al segundo método de enmienda, su rechazo según Trías Monge se debió a factores más complejos. Trías Monge, op. cit., pág. 260. En síntesis, había preocupación en cuanto al efecto que pudiera tener ese método en las relaciones políticas entre Puerto Rico y Estados Unidos. íd. No obstante, señala este tratadista que el repudio de ese método “ciertamente parece, a la distancia de tantos años de lo sucedido, como uno de los errores graves de la Convención Constituyente”. Id.
VII

La cantidad de votos necesarios en los Cuerpos Legislativos

A. En el caso de autos estamos llamados a interpretar por primera vez la cláusula constitucional que requiere el aval de dos terceras (2/3) partes de la totalidad de los miem-bros que componen cada Cámara Legislativa para la apro-bación de una proposición de enmienda constitucional.
Surge del historial de esa cláusula que la Convención Constituyente tuvo otras alternativas al voto de dos terce-ras (2/3) partes de los miembros de los Cuerpos Legislativos. En específico, la Escuela de Administración Pública de la U.P.R. consideró que el requisito de dos ter-ceras (2/3) partes de los votos dificultaba demasiado propo-ner enmiendas constitucionales, por lo cual recomendó que se permitiera a la Asamblea Legislativa proponer “una en-mienda por una mayoría absoluta de votos en un periodo, o por una simple mayoría de votos en dos períodos o sesiones *22 consecutivos”. La nueva Constitución de Puerto Rico, op. cit., pág. 523.
No obstante, la Convención Constituyente decidió no adoptar esa recomendación y, en cambio, se estableció la cláusula actual que requiere el voto de dos terceras (2/3) partes de los miembros de los Cuerpos Legislativos. Del Diario de Sesiones de la Convención Constituyente no surge una explicación de qué significa la frase “el número total de los miembros que componen cada cámara”.
Las únicas expresiones en la Convención Constituyente pertinentes a este asunto se dieron en el contexto de un debate entre los delegados Miguel A. García Méndez y José Trías Monge. El delegado García Méndez propuso que, una vez aprobada una propuesta constitucional por dos terce-ras (2/3) partes de los Cuerpos Legislativos, el electorado a su vez tendría que aprobarla con dos terceras (2/3) partes de votos a favor para que efectivamente procediera la enmienda. A este argumento, replicó Trías Monge:
... [E]stamos insertando en esta proposición de enmiendas, las garantías esenciales a la estabilidad de la constitución, en cuanto se indica que únicamente podrán proponerse enmien-das a esta constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes de los miem-bros que componen cada cámara. O sea, el punto fundamental es en cuanto a las garantías de limitación a la etapa iniciativa de la enmienda a la constitución. Ahí debidamente reconoce-mos, como se reconoce en 47 constituciones de los estados, que para iniciar una enmienda la Asamblea Legislativa, única-mente podrá hacerse por no menos de dos terceras partes ab-solutas de los miembros que componen las Cámaras Legislativas. (Énfasis suplido). 3 Diario de Sesiones de la Con-vención Constituyente de Puerto Rico 1829 (1952).
La propuesta enmienda del delegado García Méndez fue derrotada. Este intercambio abona a la interpretación que hoy estamos llamados a realizar.
Ante la ausencia explícita en la Convención Constitu-yente del significado de la frase “dos terceras partes del número total de los miembros de que se compone cada cá- *23 mara”, debemos recurrir entonces al Art. III de la Constitución, supra, el cual define la composición del Senado y de la Cámara de Representantes de Puerto Rico. Ello ya que las disposiciones de la Constitución de Puerto Rico, como lex superior, deben ser interpretadas de forma integrada y compatible entre sí.
La See. 2 del Art. III de la Constitución, supra, ed. 2008, pág. 382, dispone:
El Senado se compondrá de veintisiete Senadores y la Cámara de Representantes de cincuenta y un Representantes, excepto cuando dicha composición resultare aumentada a virtud de lo que se dispone en la Sección 7 de este Artículo. (Énfasis suplido).
Esta disposición constitucional deja claro que, en nues-tro ordenamiento jurídico, la composición de los Cuerpos Legislativos no es necesariamente estática. En un escena-rio electoral regular, la totalidad de los miembros del Se-nado es veintisiete (27) Senadores y la totalidad de los miembros de la Cámara de Representantes es cincuenta y un (51) Representantes. En ese escenario constitucional, para que una Resolución Concurrente que proponga en-miendas constitucionales sea válida dehe contar con el aval de por lo menos dieciocho (18) Senadores y treinta y cuatro (34) Representantes, lo cual representa dos terceras (2/s) partes de los miembros que componen la totalidad de los miembros de los Cuerpos Legislativos.
No obstante, la See. 2 del Art. III, supra, reconoce la posibilidad de que los Cuerpos Legislativos estén compues-tos por más miembros. Como vimos, la composición de los Cuerpos Legislativos puede resultar aumentada por lo que se dispone en la See. 7 del mismo Art. III, supra. Esa dis-posición, conocida popularmente como la “Ley de Mino-rías”, representa “un innovador mecanismo para garanti-zar la representación efectiva de las delegaciones minoritarias en la Legislatura”. Suárez Cáceres v. Com. Estatal Elecciones, 176 D.P.R. 31, 75 (2009). La disposición *24 constitucional “se activa s[o]lo bajo determinadas circuns-tancias y no siempre le asegura a los partidos políticos de minoría un número igual a la tercera parte del número total de miembros”. Id.
El Informe de la Comisión de la Rama Legislativa explicó que la “Ley de Minorías” se activa si “un partido o una sola candidatura elige más de dos terceras partes de los miembros de una cámara,[entonces] se aument[a] de manera automática la composición de esa cámara para fortalecer la representación minoritaria”. (Enfasis suplido). 4 Diario de Sesiones, supra, pág. 2596.
Así, la See. 7 del Art. III, supra, ed. 2008, págs. 385-386, dispone, en lo pertinente, los dos (2) escenarios en los cua-les puede darse el caso de aumento automático de la com-posición de los Cuerpos Legislativos:
(a) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hu-biese obtenido menos de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, se aumentará el número de miembros del Senado o de la Cámara de Represen-tantes o de ambos cuerpos, según fuere el caso, declarándose electos candidatos del partido o partidos de minoría en nú-mero suficiente hasta que la totalidad de los miembros del partido o partidos de minoría alcance el número de nueve en el Senado y de diecisiete en la Cámara de Representantes. Cuando hubiere más de un partido de minoría, la elección adi-cional de candidatos se hará en la proporción que guarde el número de votos emitidos para el cargo de Gobernador por cada uno de dichos partidos con el voto que para el cargo de Gobernador depositaron en total esos partidos de minoría.
Cuando uno o más partidos de minoría hubiese obtenido una representación en proporción igual o mayor a la propor-ción de votos alcanzada por su candidato a Gobernador, no participará en la elección adicional de candidatos hasta tanto se hubiese completado la representación que le correspondiese bajo estas disposiciones, a cada uno de los otros partidos de minoría.
(b) Si el partido o candidatura que eligió más de dos terceras partes de los miembros de cualquiera o ambas cámaras hu-biese obtenido más de dos terceras partes del total de los votos emitidos para el cargo de Gobernador, y uno o más partidos de *25 minoría no eligieron el número de miembros que les corres-pondía en el Senado o en la Cámara de Representantes o en ambos cuerpos, según fuere el caso, en proporción a los votos depositados por cada uno de ellos para el cargo de Gobernador, se declararán electos adicionalmente sus candidatos hasta completar dicha proporción en lo que fuere posible, pero los Senadores de todos los partidos de minoría no serán nunca, bajo esta disposición, más de nueve ni los Representantes más de diecisiete. (Énfasis suplido).
Nos resulta evidente y forzosa la conclusión de que, una vez se añaden escaños a los Cuerpos Legislativos por darse alguno de los escenarios provistos en la See. 7 del Art. III, supra, la composición de estos aumenta. Es decir, estos escaños legislativos tienen que tomarse en consideración al momento de determinar qué cantidad de votos es necesaria para que se alcancen dos terceras (2/3) partes de la totalidad de los miembros que componen cada Cámara.([8]) De igual forma, la interpretación que hoy hacemos del Art. VII, Sec. 1 de la Constitución de Puerto Rico, supra, se encuentra en armonía con expresiones anteriores nuestras. En particular, en Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 392, 395 (1985), interpretamos la condición que se requiere para que este Tribunal pueda declarar inconstitucional una ley, según se encuentra recogida en el Art. V, Sec. 4 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1. Como es sabido, esa sección establece que para declarar inconstitucional una ley es necesario que lo haga una “mayoría del número total de los jueces de que esté compuesto e[ste] tribunal de acuerdo con esta Constitución o con la ley”. íd., ed. 2008, pág. 412. Luego de auscultar el Diario de la Convención Constituyente, concluimos que *26 para poder declarar una ley inconstitucional se “requiere mayoría absoluta de sus miembros indistintamente de que hubiesen vacantes, por lo que éstas se sumarían en el nú-mero ideal de sus miembros”. (Enfasis en el original). Sánchez Rodríguez v. López Jiménez, supra, pág. 395.
Como se aprecia, el texto constitucional que analizamos en Sánchez Rodríguez v. López Jiménez, supra, es parecido al Art. VII, Sec. 1 de nuestra Constitución, L.P.R.A., Tomo 1. En ambas secciones, se hace referencia a la frase nú-mero total de los miembros que componen el cuerpo, sea una Cámara Legislativa o este Tribunal. Procede entonces interpretar nuestra lex superior de forma integrada. Por consiguiente, si concluimos que para que este Foro pueda declarar inconstitucional una ley al amparo del Art. V, Sec. 4, supra, es necesario el concurso de una mayoría de los miembros del Tribunal, incluyendo las vacantes, no vemos razón para arribar a un resultado distinto en este caso. Así pues, una interpretación holística de nuestra Constitución obliga a razonar que es necesario incluir las vacantes exis-tentes al momento de hacer el cómputo para auscultar si se cumplió con el requisito de dos terceras partes, según lo requiere el Art. VII, Sec. 1 de la Constitución de Puerto Rico, supra.
No podemos avalar una interpretación que permita que el número de miembros que componen cada Cámara quede a discreción de los propios legisladores, quienes ante bajas involuntarias o renuncias podrían alterar el número nece-sario para constituir dos terceras (2h) partes para proponer enmiendas constitucionales o tres cuartas (3/<0 partes para proponer una convocatoria a una Convención Constitu-yente.
B. A la luz del crisol doctrinario expuesto, pasemos a resolver si la Res. Concurrente Núm. 35 obtuvo el aval ne-cesario de dos terceras (2!s) partes de la totalidad de los miembros del Senado de Puerto Rico. Como resultado de las elecciones generales de noviembre de 2008, la composición *27 de los Cuerpos Legislativos tuvo que ser aumentada por dis-posición de la “Ley de Minorías”. Específicamente, el nú-mero de Representantes fue aumentado de cincuenta y uno (51) a cincuenta y cuatro (54), y el número de Senadores de veintisiete (27) a treinta y uno (31). No obstante, al mo-mento de considerarse la Res. Concurrente Núm. 35 el Se-nado de Puerto Rico contaba con dos (2) escaños vacantes.([9])
Así las cosas, el Senado de Puerto Rico aprobó la Res. Concurrente Núm. 35 con veinte (20) votos a favor, ocho (8) en contra, una (1) ausencia y dos (2) vacantes. El P.I.P. argumenta que, si se toman en consideración los escaños vacantes, la Resolución Concurrente contó con el aval del sesenta y cuatro porciento (64%) de los miembros del Se-nado, por lo cual no se logró el aval de dos terceras (2k) partes del Cuerpo.
A contrario sensu, el Gobierno de Puerto Rico argu-menta que los escaños vacantes no deben ser tomados en consideración ya que, al momento de la votación, el Senado de Puerto Rico, en efecto, se componía de veintinueve (29) senadores. Por ende, la Res. Concurrente Núm. 35 contó con el aval de dos terceras (2h) partes de los senadores al alcanzar el sesenta y ocho porciento (68%) de los votos a favor. No le asiste la razón al peticionario.
Como discutimos, los escaños vacantes tienen que to-marse en consideración al momento de determinar la tota-lidad de los miembros de los Cuerpos Legislativos. La See. 2 del Art. Ill de la Constitución de Puerto Rico, supra, es-tablece que el Senado se compondrá de veintisiete (27) se-nadores, a menos que su composición se viera alterada por la aplicación de la “Ley de Minorías”. Siendo ello así, la Res. Concurrente Núm. 35 no contó con el número necesa-rio de votos a favor al momento de su votación inicial el 10 de octubre de 2011.
Ahora bien, nuestra encomienda en el caso de epígrafe *28 no culmina ahí. El 14 de mayo de 2012, los Cuerpos Legis-lativos aprobaron la Resolución Concurrente Núm. 60, 16ta Asamblea Legislativa, 7ma Sesión Ordinaria (en ade-lante Res. Concurrente Núm. 60) en la que se acordó pro-ponerle al Pueblo enmendar la Sec. 11 del Art. II de la Constitución, L.P.R.A., Tomo 1, para restringir el derecho a la fianza en casos específicos. En esa Resolución, los Cuer-pos Legislativos expresaron lo siguiente:
La enmienda propuesta en esta Resolución Concurrente será sometida para su aprobación o rechazo a los electores capacitados en Puerto Rico en un Referéndum Especial a ce-lebrarse el 19 de agosto de 2012, conjunto con la consulta para enmendar la Constitución a los fines de cambiar la composi-ción de la Asamblea Legislativa, propuesta en la Resolución Concurrente del Senado Núm. 35, según la voluntad expresada por esta Asamblea Legislativa con la aprobación de la misma y la cual reiteramos en la presente Resolución Concurrente.([10]) (Énfasis suplido). Res. Concurrente Núm. 60, supra, págs. 11-12.
Esta resolución fue aprobada en la Cámara de Repre-sentantes con cuarenta y tres (43) votos a favor, ocho (8) en contra y dos (2) ausencias. Por su parte, en el Senado de Puerto Rico fue aprobada con veintidós (22) votos a favor, siete (7) en contra y un (1) senador ausente. Evidente-mente, la Res. Concurrente Núm. 60 se aprobó con el aval de dos terceras (%) partes de los miembros que componen la totalidad de los miembros de ambos Cuerpos Legislativos.
Por su pertinencia al caso de autos, conviene exponer específicamente la votación del Senado de Puerto Rico que aprobó la Res. Concurrente Núm. 60. La votación fue la siguiente:
Senador Voto
Arce Ferrer, Luz Z. A favor
*29 Berdiel Rivera, Luis A. A favor
Bhatia Gautier, Eduardo En contra
Burgos Andújar, Norma E. A favor
Dalmau Santiago, José L. En contra
Díaz Hernández, José R. A favor
Fas Alzamora, Antonio J. En contra
Fernández Rodriguez, Liza M. A favor
Garcia Padilla, Alejandro En contra
González Calderón, Sila M. A favor
González Velázquez, José E. A favor
Hernández Mayoral, Juan E. En contra
Iglesias Suárez, Roger A favor
Martinez Santiago, Ángel A favor
Muñiz Cortés, Luis D. A favor
Nolasco Santiago, Margarita A favor
Padilla Alvelo, Migdalia A favor
Peña Ramírez, Itzamar A favor
Raschke Martínez, Rdmmmey A favor
Ríos Santiago, Carmelo A favor
Rivera Schatz, Thomas A favor
Rodríguez Martínez, Miguel A. A favor
Romero Donnelly, Melinda K. Ausente
Santiago González, Luz M. A favor
Seilhamer, Rodríguez, Lawrence A favor
Soto Villanueva, Lornna J. A favor
Suárez Cáceres, Jorge I. En contra
Tirado Rivera, Cirilo En contra
Torres Torres, Carlos J. A favor
Vázquez Nieves, Evelyn A favor([11])
No hay duda de que la voluntad de más de dos terceras (2/s) partes de los miembros del Senado de Puerto Rico es *30 proponerle al Pueblo una enmienda constitucional para re-ducir el tamaño de la Legislatura. Ningún Juez de este Tribunal puede controvertir ese hecho. Y es que las Resoluciones Concurrentes son expresiones que revelan la volun-tad de los Cuerpos Legislativos([12]) y en la Res. Concurrente Núm. 60, supra, esa voluntad de más de dos terceras (2/s) partes de los miembros del Senado de Puerto Rico fue “reiterar” lo dicho en la Res. Concurrente Núm. 35. Según la Real Academia Española, el verbo reiterar signi-fica “volver a decir o a hacer algo”([13])
Sustentándose en que las Resoluciones Concurrentes deben estar atadas a los requisitos constitucionales nece-sarios para la aprobación de las leyes, el P.I.P. aduce que la Res. Concurrente Núm. 60 no podía reiterar lo expresado en la Res. Concurrente Núm. 35 porque el asunto de re-forma legislativa no se expresó en su título y esta contendría entonces más de un asunto, en violación a la Sec. 17 del Art. III de la Constitución, L.P.R.A., Tomo 1. No le asiste la razón.
De entrada, aun si fuera cierto que las Resoluciones Concurrentes están atadas al procedimiento constitucional para la aprobación de las leyes, hemos interpretado que el requisito de “un solo asunto” en las leyes se interpreta liberalmente. Herrero y otros v. E.L.A., 179 D.P.R. 277, 296 (2010). A esos fines hemos dicho que “s[o]lo ante un caso claro y terminante se justifica anular una ley por violar dicha disposición constitucional. ... [hjemos *31 adoptado una postura compresiblemente laxa para no ma-niatar al legislador. ... Una interpretación estricta de la disposición constitucional podría impedir y obstaculizar el proceso legislativo, pues obligaría al legislador a aprobar múltiples leyes para regular un s[o]lo asunto o materia general”. íd., pág. 295.
Pero la realidad constitucional es que nada impide que el Senado de Puerto Rico, mediante una Resolución Concu-rrente posterior, reitere lo hecho en una anterior. Sencilla-mente no estamos ante una ley ordinaria, sino ante un proceso legislativo diseñado para recoger la voluntad de un Cuerpo, el cual no está atado a los procedimientos consti-tucionales que se requieren para la aprobación de las leyes. Véase N.J. Singer et als., Sutherland Statutory Construction, Ed. West, 2009, 7ma Ed., pág. 648 (2009). A esos efectos, el profesor Gorrín Peralta, uno de los abogados del expediente de la parte recurrida, define una resolución concurrente como aquellas que “tratan sobre asuntos de la incumbencia de ambas Cámaras Legislativas y para decla-raciones legislativas que no tienen fuerza de ley. Como son declaraciones exclusivas del poder legislativo y no crean normas de aplicación general, no requieren la firma del ejecutivo”. C.I. Gorrín Peralta, Fuentes y proceso de investigación jurídica, New Hampshire, Ed. Equity, 1991, págs. 296-297.
Lo anterior significa que las Resoluciones Concurrentes no están sujetas a las reglas y los procedimientos necesa-rios para aprobar una ley. Esta interpretación es cónsona con la Constitución de Puerto Rico, la cual guarda silencio en cuanto a la definición de las Resoluciones Concurrentes. No obstante, en la Sec. 18 del Art. III se establece que “[s]e determinará por ley los asuntos que puedan ser objeto de consideración mediante resolución conjunta, pero toda re-solución conjunta seguirá el mismo trámite de un proyecto de ley”. (Énfasis suplido). Const. P.R., L.P.R.A., Tomo 1, ed. 2008, pág. 399. Los padres de la Constitución no impusie- *32 ron ese requisito a la resolución concurrente, por lo cual no debe imponerlo este Tribunal como sostiene el recurrido. En palabras de la Jueza Asociada del Tribunal Supremo federal Elena Kagan, el estándar propuesto por el P.I.R, en cuanto a las Resoluciones Concurrentes, “comes from ... well, from nowhere”. Martel v. Clair, 132 S. Ct. 1276, 1285 (2012).
Reiterada la Res. Concurrente Núm. 35 a través de la Res. Concurrente Núm. 60, no procede entonces que este Tribunal eche a un lado la voluntad de dos terceras (2/ 3) partes del Senado de Puerto Rico. Según intimado, con la aprobación de la Res. Concurrente Núm. 60 se reiteró la voluntad del Senado expresada en la Res. Concurrente Núm. 35, por lo cual no tiene razón el recurrido P.I.R en su argumento de que esta última no fue correctamente aprobada.
VIII

El propósito único y la cantidad de enmiendas propuestas

A. Debidamente resuelta la controversia en cuanto a la aprobación de la Res. Concurrente Núm. 35 pasamos a resolver la interrogante en cuanto a la cantidad de enmien-das que se le propone presentar al Pueblo.
Según hemos discutido, la Sec. 1 del Art. VII de la Constitución, supra, establece unos límites a las propuestas de enmiendas que la Asamblea Legislativa puede presentar para la aprobación del Pueblo. En lo pertinente, esa sección establece:
Cada proposición de enmienda deberá votarse separada-mente y en ningún caso se podrá someter más de tres proposi-ciones de enmienda en un mismo referéndum. (Énfasis suplido). íd., ed. 2008, pág. 442.
El límite de tres (3) propuestas de enmienda fue reco-mendado favorablemente a la Convención Constituyente *33 por la Escuela de Administración Pública de la U.P.R. Es-pecíficamente, se dijo que “[p]ara que los ciudadanos voten con conocimiento de causa, no se les puede sobrecargar so-metiéndoles varias enmiendas a la vez. Es importante, por lo tanto, que se imponga alguna clase de límites al número de enmiendas que puede someterse al electorado”. La nueva Constitución de Puerto Rico, op. cit., pág. 532. La adopción del límite de tres (3) propuestas constitucionales se debió en gran parte a que ese era el modelo de la mayo-ría de los estados de la Unión al momento de redactarse la Constitución de Puerto Rico. Véase Trías Monge, op. cit., pág. 258.
Este Tribunal interpretó por primera vez la cláusula de limitación numérica y la de separabilidad de proposiciones en Berríos Martínez v. Gobernador II, supra. En ese caso, establecimos que “se trata de una sola proposición [de enmienda] si el texto contiene los detalles necesarios para lograr un ‘único propósito’, de forma que para lograr ese objetivo sea indispensable que todos sean aprobados o rechazados a la vez”. íd., pág. 219. A esos efectos, aclaramos que
... será necesario evaluar cada enmienda tomando en consi-deración que la definición del concepto “propósito” no puede ser tan abarcadora como para incluir en su ámbito cualquier combinación de proposiciones como una sola enmienda. Tam-poco puede ser tan rígida como para hacer imposible enmen-dar la Constitución. íd.
En Berríos Martínez v. Gobernador II, supra, evaluamos la constitucionalidad de dos (2) propuestas de enmienda que la Asamblea Legislativa aprobó para ser consultadas al Pueblo. La primera proponía limitar a dos (2) términos el cargo de Gobernador de Puerto Rico y a tres (3) términos los cargos de legisladores y alcalde. La segunda, proponía al Pueblo aumentar y fijar en nueve (9) el número de jue-ces de este Tribunal y eliminar la facultad exclusiva de *34 este Foro de iniciar procedimientos para modificar el nú-mero de sus miembros.
Utilizando el estándar anunciado de “propósito único”, en votación 4-3, resolvimos que la primera propuesta cons-titucional que limitaba los cargos de funcionarios electivos era inconstitucional ya que no perseguía un fin único: se trataba de “enmiendas totalmente independientes entre sí, que han sido hilvanadas artificial y superficialmente, y no satisfacen los criterios constitucionales de unidad de propósito”. Berríos Martínez v. Gobernador II, supra, pág. 221.([14])
Nuestra decisión en Berríos Martínez v. Gobernador II, supra, ha sido objeto de severas críticas por parte de reco-nocidos académicos y Jueces de este Foro. Estas críticas no se han dirigido al estándar anunciado en la opinión, sino a su aplicación a los hechos particulares de ese caso. La pri-mera crítica la esbozó la entonces Jueza Asociada Señora Naveira de Rodón en la Opinión Concurrente y Disidente que emitió en Berríos v. Gobernador II, supra. La Jueza Asociada Señora Naveira de Rodón no tenía reparos con el estándar de “propósito único”, utilizado por la mayoría del Tribunal, pero discrepó de su aplicación a los hechos del caso.
Pero la crítica más severa a la aplicación del estándar de “propósito único” ha sido la del profesor José Julián Alvarez González. Este ha opinado que “[l]a mayoría [en Berríos Martínez v. Gobernador II, supra,] sentó una teoría mínimamente adecuada para definir el concepto de ‘propo-sición de enmienda’, pero se estrelló a la hora de aplicarla”. (Enfasis suplido). J.J. Álvarez González y A.I. García *35 Saúl, Derecho constitucional, 65 Rev. Jur. U.RR. 799, 868 (1996).([15])
A pesar de las críticas que se han hecho a la aplicación del estándar de “propósito único” que una mayoría del Tribunal realizó en Berríos Martínez v. Gobernador II, supra, entendemos que el estándar articulado por el Tribunal en ese caso es la manera correcta de acercarse a estas controversias. Hoy nos reafirmamos en ese estándar: se trata de un propósito único si la propuesta presenta al Pueblo un solo fin, objetivo o meta. Si todos los elementos adicionales de la enmienda son incidentales y razonablemente necesarios para llevar a cabo el fin, objetivo o meta de la propuesta, la enmienda contiene un único propósito.
B. De acuerdo con el análisis discutido, pasemos a de-terminar si la proposición de enmienda aprobada por la Asamblea Legislativa en la Res. Concurrente Núm. 35 y reiterada en la Res. Concurrente Núm. 60 persigue un único propósito.
In limine, el Gobierno de Puerto Rico sostiene que la enmienda constitucional objeto de controversia tiene un único propósito: reducir el número de escaños en la Asam-blea Legislativa de Puerto Rico. A contrario sensu, el P.I.P. alega que se trata en realidad de más de un asunto ya que se proponen nueve (9) cambios al texto del Art. III de la *36 Constitución y que un elector razonable podría querer vo-tar a favor de algunos de esos cambios y en contra de otros.
De entrada, no nos convence el argumento del P.I.P., un tanto simplista, de que cada cambio al texto de la Consti-tución constituye una proposición de enmienda indepen-diente. Ese estándar de análisis ya fue rechazado por este Tribunal en Berríos Martínez v. Gobernador II, supra. Por ende, como primer paso para contestar la interrogante de si la enmienda constitucional en controversia persigue un único fin, meta u objetivo debemos primero preguntarnos qué es lo se le propone al Pueblo y qué pregunta tiene que contestar el elector al momento de ejercer su voto. En se-gundo lugar, debemos determinar si los cambios en el texto son incidentales y razonablemente necesarios para alcan-zar ese fin.
Entendemos que el Pueblo tendrá ante sí una sola pre-gunta que contestar: ¿debe reducirse el número de escaños disponibles en las Cámaras Legislativas? Ese es el único fin que persigue la enmienda constitucional propuesta en la Res. Concurrente Núm. 35 y reiterada en la Res. Concurrente Núm. 60. Debemos entonces determinar si los cam-bios que se proponen al texto del Art. III de la Constitución, supra, son incidentales a ese fin y razonablemente necesarios para llevarlo a cabo.
Entendemos que los cambios son incidentales y absolu-tamente necesarios para que el fin de reducir los escaños legislativos pueda darse. Por obligación, si se quiere redu-cir el número de escaños de uno de los Cuerpos Legislativos, tienen que hacerse cambios en la cantidad de distritos representativos o senatoriales para evitar que algunos de estos se queden vacantes o no tengan representación adecuada. Además, si se reduce el número total de escaños de las Cámaras Legislativas por obligación habría que re-ducir el número máximo de legisladores que entrarían por las disposiciones de la “Ley de Minorías”, ya que el número que compone una tercera (V3) parte de cada cuerpo queda *37 alterado. Actualmente, una tercera parte de veintisiete (27) es nueve (9), pero si se reduce el numero de escaños a diecisiete (17), una tercera (V3) parte es seis (6). Vemos entonces que la propuesta de enmienda constitucional as-pira a alterar la composición de los Cuerpos Legislativos, nada más. No existe proposición para trastocar sus poderes constitucionales o alterar la manera como los Cuerpos funcionan.
A su vez, y al igual que expresamos en Berrios v. Gober-nador II, supra, cuando analizamos la enmienda constitu-cional que proponía fijar en nueve (9) el número de jueces de este Tribunal, un elector razonable no se vería en la encrucijada de votar a favor de disposiciones de las cuales pudiera estar en contra. El propósito de la Asamblea Le-gislativa fue uno: reducir la totalidad de los miembros de ambas Cámaras Legislativas, pero sin alterar la propor-ción de legisladores por acumulación y por distrito, ni el tamaño relativo entre las cámaras. Para ello, por obliga-ción hay que enmendar el número de distritos senatoriales y representativos y hay que reducir el número de legisla-dores por adición en caso de activarse la “Ley de Minorías”. Sería irrazonable pensar que un elector esté a favor de reducir los escaños legislativos de ambos Cuerpos Legisla-tivos, pero desee conservar la misma cantidad de distritos legislativos y la misma cantidad de legisladores por adición. La única forma de llegar al fin único que persigue la enmienda es a través de los cambios que se proponen al texto del citado Art. III.
Una interpretación contraria a la cual llegamos hoy ten-dría como consecuencia lo que el profesor Alvarez González llamó “la muy peligrosa píldora” que el Pueblo tendría que tragar. Si toda enmienda constitucional que proponga cam-bios a la estructura de la Asamblea Legislativa contuviera más de un propósito, nunca se podría llevar a cabo una reforma legislativa mediante el método de referéndum. Para ese fin, el Pueblo tendría que jugar “la ruleta consti- *38 tucional” y convocar una Convención Constituyente, la cual no está atada por agenda alguna y podría alterar el documento constitucional en su totalidad. Rehusamos ava-lar ese absurdo.
El estándar que adoptamos en Berríos v. Gobernador II, supra, y que hoy reafirmamos no se traduce a que la Asam-blea Legislativa pueda confeccionar cualquier amalgama de asuntos e incluirlos bajo una propuesta de enmienda constitucional con un “propósito único” abstracto. A ma-nera de ejemplo, no podría proponerse una enmienda cons-titucional para “reformar la Rama Ejecutiva” que incluya cualquier tipo de combinación de cambios al texto consti-tucional que describa el ámbito, los poderes y requisitos de la Rama Ejecutiva. Tiene que proponérsele al Pueblo una pregunta que contenga un solo tema, objetivo o fin. Si la enmienda de “Reforma de la Rama Ejecutiva” contuviera enmiendas relacionadas a los requisitos para ocupar el puesto de Gobernador, unido a un cambio en los poderes del Ejecutivo y una limitación de dos (2) términos a quien ocupe esa posición, no estaríamos ante un propósito único porque se incumple con el primer paso del estándar que hoy clarificamos: el Pueblo tendría ante sí más de un fin, objetivo o meta en la propuesta enmienda constitucional, por lo cual la proposición de enmienda no procedería.
En conclusión, los cambios que se proponen al texto del citado Art. Ill de la Constitución en la Res. Concurrente Núm. 35 están inexorablemente entrelazados con el fin único de reducir los escaños legislativos. Por ende, estos son incidentales al propósito único de la enmienda, lo cual forzosamente nos lleva a concluir que no tiene razón el P.I.P. en su planteamiento de que se viola el principio de separabilidad al presentarse más de tres (3) propuestas de enmienda al Pueblo el 19 de agosto de 2012.
*39 IX

La convocatoria de la Junta Constitucional Revisora de Distritos Senatoriales y Representativos

En otro ataque constitucional a la Res. Concurrente Núm. 35 y su propuesta de enmienda, el RI.R sostiene que es inconstitucional la See. 4 de esa Resolución la cual dis-pone que, de resultar favorecida la enmienda, el Goberna-dor de Puerto Rico convocará a la Junta Constitucional Revisora de Distritos Senatoriales y Representativos para confeccionar los nuevos distritos que vayan acorde con la nueva estructura de la Asamblea Legislativa.
La Junta Constitucional Revisora de Distritos Senatoriales y Representativos es un ente con vida temporera provisto por la See. 4 del Art. III, supra. En específico, esa disposición constitucional establece:
En las primeras y siguientes elecciones bajo esta Constitu-ción regirá la división en distritos senatoriales y representati-vos que aparece en el Artículo VIII. Dicha división será revi-sada después de cada censo decenal a partir del año 1960, por una Junta que estará compuesta del Juez Presidente del Tribunal Supremo como Presidente y de dos miembros adiciona-les nombrados por el Gobernador con el consejo y consenti-miento del Senado. Los dos miembros adicionales no podrán pertenecer a un mismo partido político. Cualquier revisión mantendrá el número de distritos senatoriales y representati-vos aquí creados, los cuales estarán compuestos de territorios contiguos y compactos y se organizarán, hasta donde sea po-sible, sobre la base de población y medios de comunicación. Cada distrito senatorial incluirá siempre cinco distritos representativos. La junta adoptará sus acuerdos por mayoría y sus determinaciones regirán para las elecciones generales que se celebren después de cada revisión. La Junta quedará disuelta después de practicada cada revisión. (Enfasis suplido). íd., ed. 2008, pág. 383.
Según Trías Monge, existía división entre los miembros de la Convención Constituyente en cuanto a cuál sería el *40 mejor método para revisar la demarcación de los distritos legislativos en Puerto Rico. Los delegados socialistas pro-ponían que la división original fuera realizada por una Junta Insular de Elecciones. A contrario sensu, los delega-dos del Partido Estadista Republicano no favorecían una revisión periódica, sino que preferían que fuese la propia Asamblea Legislativa la que revisara los distritos electorales. Finalmente, la Escuela de Administración Pú-blica de la U.P.R. proponía que fuese una Junta no política la que revisara los distritos legislativos en intervalos de diez (10) años. Véase Trías Monge, op. cit., pág. 147.
Ninguna de estas propuestas fue acogida por la Conven-ción Constituyente. A final de cuentas, fue la intención de los Padres de la Constitución el que, luego de cada censo decenal, el Gobernador nombrara a dos (2) personas de partidos distintos para que, junto al Juez Presidente del Tribunal Supremo de Puerto Rico, procedieran a revisar la distribución de los distritos legislativos.
El P.I.P. argumenta que es inconstitucional la See. 4 de la Res. Concurrente Núm. 35 que dispone para que el Go-bernador de Puerto Rico convoque a la Junta Constitucio-nal Revisora si el electorado avala la enmienda constitucio-nal en controversia. Alega que el texto constitucional prohíbe que la Junta Constitucional Revisora sea convo-cada en más de una ocasión en un decenio.
No nos convence este argumento del P.I.P. No hemos encontrado nada en el texto de la Constitución ni en el historial de la Convención Constituyente que prohíba que la Junta Constitucional Revisora de Distritos Legislativos sea convocada en más de una ocasión en una década. Si bien el texto constitucional establece que la Junta quedará disuelta después de cada revisión constitucional, ello no se traduce a que esta no puede volver a ser convocada en un decenio. En vez, esa disposición lo que prohíbe es que, una vez constituida la Junta, esta pueda continuar revisando los distritos electorales luego de realizarse la primera re- *41 visión para la cual fue convocada. Por ende, no existe pro-hibición constitucional alguna que impida que la Junta sea convocada para realizar una revisión de los distritos legis-lativos en medio de una década, utilizando los datos del último censo.
X

Los anuncios publicados

Como último ataque constitucional, el P.I.P. plantea una serie de cuestionamientos a los anuncios que se han publi-cado para informar a la ciudadanía en cuanto a la celebra-ción del Referéndum de 19 de agosto de 2012.
La Sec. 1 del Art. VII de la Constitución, supra, dispone, en lo pertinente, que:
... Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum. (Énfasis suplido). íd., ed. 2008, pág. 442.
Al igual que en varios de los asuntos que hemos aten-dido en el caso de autos, el historial de la Convención Cons-tituyente guarda silencio en cuanto a cómo se debe publi-car una proposición de enmienda.
En cuanto al asunto de los anuncios, los hechos siguien-tes están incontrovertidos. El 18 de mayo de 2012, antes de vencer el término de tres (3) meses que provee la Consti-tución para que se publique una proposición de enmienda, fue publicada por varios medios de comunicación una pro-clama en la cual se le anuncia al Pueblo, inter alia, la apro-bación de la Ley Núm. 12. La Proclama le anuncia al Pueblo que la propuesta enmienda constitucional tiene como fin “restructurar el Poder Legislativo mediante una reduc-ción en el número de miembros de la Asamblea Legislativa; para determinar su estructura y operación; asignar fondos para la celebración del referéndum y otros fines relacionados”.
*42 Por otro lado, la Ley Núm. 12 le ordena a la C.E.E. a publicar con no menos de sesenta (60) días de antelación a la celebración del referéndum el texto íntegro de las en-miendas constitucionales propuestas.([16]) Efectivamente, el 20 de junio de 2012, la C.E.E. publicó un anuncio en el cual se incluyeron las enmiendas que se proponen al texto del Art. III de la Constitución. No obstante, y según discutie-ron las partes en la Vista Oral celebrada el 27 de junio de 2012, por alguna razón la C.E.E. omitió incluir en ese anuncio el texto de los cambios propuestas a la See. 4 del Art. III de la Constitución. Sin embargo, este anuncio fue publicado nuevamente el 28 de junio de 2012 y en esta ocasión sí se incluyó el texto íntegro de la secciones que serían enmendadas.
No nos mueven los argumentos que ha presentado el P.I.P. para tratar de invalidar el referéndum de 19 de agosto basado en defectos en la publicación de las enmiendas. Primero, es incontrovertible el hecho de que las propuestas enmiendas constitucionales fueron publica-das antes de tres (3) meses de la celebración del referén-dum en el Diario de Sesiones de los Cuerpos Legislativos. Por otro lado, se publicó una Proclama en varios medios de comunicación, en el cual se anuncia la celebración del re-feréndum y se describen los propósitos de las enmiendas. Segundo, el texto íntegro de las enmiendas constituciona-les ya fue publicado en los sesenta (60) días que la Ley Núm. 12 ordenó para su publicación.
Nos parece absurdo proveer una interpretación consti-tucional al texto del Art. VII de la Constitución, supra, que le permita a un medio de comunicación obtener un poder de veto sobre las propuestas de enmiendas constituciona-les que la Asamblea Legislativa tenga a bien hacer. Si in-terpretáramos que una omisión en la publicación de un anuncio de enmienda constitucional por parte de un medio *43 de comunicación masiva pudiera tener el efecto de invali-dar una propuesta para que sea el Pueblo quien se exprese en cuanto a si desea alterar su lex superior sería una burla a todo el sistema constitucional. De facto, se le reconocería a un periódico o a la C.E.E. el poder de ir por encima de la voluntad de los Cuerpos Legislativos, y en última instan-cia, del Pueblo de Puerto Rico.
Por todo lo cual, no encontramos vicios constitucionales en la publicación de las enmiendas constitucionales pro-puestas a través de la Res. Concurrente Núm. 35.
I — I X
Como en toda controversia constitucional, es razonable que existan diferencias de criterio en cuanto a la interpre-tación de las disposiciones del texto constitucional pertinente. Por ende, nos parece necesario atender algunos asuntos discutidos en las opiniones disidentes que hoy se emiten.
El disenso del Juez Presidente Señor Hernández Den-ton concluye que los requisitos que la Constitución estable-ció para los proyectos de ley, en específico el requisito de un solo asunto, aplican a las Resoluciones Concurrentes que los Cuerpos Legislativos aprueben para proponer enmien-das a la Constitución de Puerto Rico. En parte, el Juez Presidente basa su conclusión en una lectura acomodaticia de la Regla 17.3 del Reglamento del Senado de Puerto Rico. No obstante, una lectura integral de otras disposiciones reglamentarias revela la imposibilidad de su interpre-tación.
Específicamente, la Regla 17.2 del Reglamento del Se-nado de Puerto Rico, pág. 56, en lo pertinente, dispone:
Las Resoluciones Concurrentes, excepto las que propongan enmiendas a la Constitución, luego de radicadas serán referi-das a la Comisión de Reglas y Calendario, la cual rendirá su informe, radicándolo en Secretaría.
*44 A contrario sensu, la Regla 17.3 del Reglamento del Senado de Puerto Rico, pág. 57, establece, en lo pertinente:
Las Resoluciones Concurrentes que propongan enmiendas a la Constitución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley, siendo referidas para su consideración y estudio a las Comisiones Permanentes o Espe-ciales que a estos efectos se disponga.
Según intimado, el Juez Hernández Denton interpreta que mediante la Regla 17.3 el Senado de Puerto Rico se autoimpuso mediante reglamento que las Resoluciones Concurrentes que propongan enmiendas a la Constitución deben cumplir los mismos requisitos constitucionales que deben cumplir los proyectos. Esa interpretación no está acorde con el funcionamiento interno de los Cuerpos Legis-lativos ni con una lectura integrada del Reglamento del Senado.
Lo que hace la Regla 17.3 es diferenciar el trámite in-terno de las Resoluciones Concurrentes que propongan en-miendas constitucionales. Esas Resoluciones Concurren-tes, al igual que un proyecto de ley, serán referidas para su consideración a las Comisiones Permanentes o Especiales que tengan la encomienda de evaluar ese tipo de medida. Ese es el trámite interno de los proyectos de ley que regula el Reglamento del Senado. Por ende, el Senado de Puerto Rico mediante reglamento quiso evitar que una resolución concurrente que proponga enmiendas a la Constitución fuera referida a la Comisión de Reglas y Calendario, sino que se refiriera a la comisión permanente o especial que se haya creado y que tenga pericia en el asunto del que ver-san las enmiendas constitucionales. Esa es la conclusión razonable a la cual debemos llegar para dar coherencia a esa disposición del Senado de Puerto Rico.
Por el contrario, si sostuviéramos la interpretación que hace el Juez Hernández Denton en cuanto a la Regla 17.3 del Reglamento del Senado de Puerto Rico, tendríamos que *45 concluir también que los demás requisitos constitucionales que deben cumplir los proyectos de ley aplican a las Reso-luciones Concurrentes que propongan enmiendas a la Constitución. Así que, según la lógica del Juez Presidente, ese tipo de Resoluciones Concurrentes sí requerirían la firma del Gobernador, ya que ese es el “trámite” de un pro-yecto de ley. Una lectura integrada del Reglamento del Se-nado de Puerto Rico impide avalar esa interpretación.
Por otro lado, parte de las expresiones que el Juez Her-nández Denton emite hoy chocan irremediablemente con lo que suscribió a nombre del Tribunal en Berríos Martínez v. Gobernador II, supra. Específicamente, en ese caso el en-tonces Juez Asociado Hernández Denton expresó que ante la labor de interpretar si las propuestas de enmienda que tenía el Tribunal ante sí en 1994 eran constitucionales, llevaríamos a cabo nuestra función constitucional “con el pleno convencimiento de que nuestra labor no es juzgar la sabiduría de las enmiendas propuestas, sino su constitucionalidad”. Id., pág. 202.
Sorpresivamente, hoy el Juez Hernández Denton emite una opinión disidente en la cual hace expresamente lo contrario. En específico, dice que hoy estamos validando “la propuesta de unas enmiendas a nuestra Ley Suprema que cambian el ordenamiento constitucional actual, que le permite a las minorías tener una mayor posibilidad de es-tar representadas adecuadamente en la Asamblea Legislativa”. Opinión disidente del Juez Presidente Señor Hernández Denton, pág. 49. Además, el Juez Hernández Denton aduce que “[l]a aprobación de estas enmiendas po-dría conllevar el destierro de los partidos minoritarios, ya que un tercer partido político difícilmente obtendrá un es-caño en la Asamblea Legislativa”. íd., pág. 76.
Estas expresiones son perturbadoras. Primero, abierta-mente el Juez Hernández Denton utiliza su rol constitucio-nal para juzgar las bondades de una propuesta de en-mienda, enviando al olvido sus propias palabras de otros *46 tiempos. Segundo, sus expresiones en esencia se traducen a un voto explicativo de por qué el Juez Hernández Denton habrá de votar “NO” el 19 de agosto de 2012 en el referén-dum que propone reducir los escaños en la Asamblea Legislativa. Es lamentable que las páginas de Decisiones de Puerto Rico se utilicen para esa labor. Por nuestra parte, sostenemos que no nos compete como miembros del Tribunal Supremo juzgar la sabiduría de las propuestas de enmienda. Esa labor es del Pueblo; única, exclusiva y ter-minantemente del Pueblo.
Por otra parte, el disenso de la Jueza Asociada Señora Fiol Matta se sustenta en prosa elegante, pero se encuen-tra laxo de citas de derecho constitucional pertinentes. A la Jueza Fiol Matta le preocupa que si la Constitución de Puerto Rico no prohíbe expresamente “algo”, este Tribunal interprete que ese “algo” sí se pueda hacer. Concluye que al no encontrar una definición específica de aquellas partes de la Constitución que contienen “silencios”, este Tribunal claudica su función constitucional de interpretar la Cons-titución y debilita el concepto de la revisión judicial. Nada más lejos de la verdad. Precisamente son esos “silencios” los que hoy interpretamos. La distinguida compañera difiere de esa interpretación y cataloga de peligroso “encon-trar en el silencio el fundamento para no ser rigurosos”. En realidad, en su disenso la Jueza Fiol Matta procede con la peligrosa suposición de que, en nuestro ejercicio de inter-pretación, la Constitución significa lo que nosotros como Jueces quisiéramos que significara. Ello no puede ser así. Las disposiciones constitucionales significan exactamente lo que dicen, y encontrar prohibiciones en el silencio cons-titucional convertiría a los Jueces de este Tribunal en miembros ex post facto de la Convención Constituyente. El que en una sociedad constitucional democrática ese poder lo ostenten los nueve (9) Jueces que en un momento dado compongan este Tribunal es verdaderamente perturbador.
*47 XII
Para finalizar, y a pesar del entramado constitucional involucrado en el caso de autos, no podemos perder de vista que, según expresó el Juez Presidente del Tribunal Supremo federal John G. Roberts hace unos días, al anali-zar un ataque constitucional a una pieza legislativa “every reasonable construction must be resorted to, in order to save a statute from unconstitutionality”. National Federation of Independent Business v. Sebelius, 132 S. Ct. 2566 (2012), citando a Hooper v. California, 155 U.S. 648, 657 (1895). No hemos encontrado vicio constitucional alguno en el procedimiento llevado a cabo por la Asamblea Legis-lativa para proponerle al Pueblo una enmienda a su Constitución. El hecho de que el proceso legislativo sea complejo, frustrante y, francamente, difícil de comprender, no necesariamente se traduce a que con cada traspié legis-lativo se incurra en fallas constitucionales.

Además, no debemos olvidar que en última instancia será el Pueblo de Puerto Rico el llamado a decidir sobre la procedencia de las enmiendas constitucionales propuestas. No hemos encontrado vicios constitucionales que impidan que la voluntad del Pueblo se exprese en las urnas. Nueva-mente, no le compete a este Foro juzgar la sabiduría, los defectos o las bondades de las propuestas constitucionales que tendrá el Pueblo ante sí el 19 de agosto de 2012. Ante la ausencia de defectos constitucionales en la aprobación de las propuestas de enmienda, la “doctrina de separación de poderes” nos obliga a dar deferencia al proceso político y a que sea el Pueblo el juzgador final de la enmienda consti-tucional objeto del caso de autos.

*48 XIII
Atendidos todos los asuntos presentados por las partes y por todo lo antes discutido, se desestima la demanda pre-sentada por el recurrido P.I.P. Consecuentemente, se sos-tiene la constitucionalidad de la Res. Concurrente Núm. 35 y la Ley Núm. 12, por lo cual nada impide la celebración del referéndum de 19 de agosto de 2012. Se dictará senten-cia de conformidad.
El Juez Presidente Señor Hernández Denton emitió una opinión disidente, a la cual se unió la Jueza Asociada Se-ñora Fiol Matta. La Jueza Asociada Señora Fiol Matta emitió una opinión disidente, a la cual se unió la Juez Aso-ciada Señora Rodríguez Rodríguez. La Juez Asociada Se-ñora Rodríguez Rodríguez emitió una opinión disidente. El Juez Asociado Señor Estrella Martínez emitió la expresión siguiente:
El Juez Asociado Señor Estrella Martínez está conforme con las partes I, II, IV, VI, VII-A, VIII y X, concurre con los acápi-tes III y V, y disiente de las partes identificadas como VII-B, IX, XI, XII y XIII.
— O —

(1) Ese mismo día, y a tenor con la Resolución Concurrente del Senado Núm. 60, se le propondrá al Pueblo enmendar la Sec. 11 del Art. II de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, para disponer que el derecho a la fianza será discrecional en casos de asesinato cometido con premeditación, deliberación o acecho, asesinato co-metido en medio de un robo en el hogar, asesinato cometido en el curso de una agresión sexual o secuestro, asesinato cometido al disparar un arma de fuego desde un vehículo de motor o en un lugar abierto al público, poniendo en riesgo la vida de más de una persona, o cuando la víctima del asesinato sea un agente del orden público que se encuentre en el cumplimiento de su deber. Su constitucionalidad no está en controversia en el caso de autos.

(2) Para la encomienda constitucional que tenemos ante nos contamos también con la comparecencia como amicus curiae del Partido Nuevo Progresista y del Ledo. Eudaldo Báez-Galib.

(3) Tampoco nos convence el argumento del Gobierno de Puerto Rico en cuanto a que el caso de autos no es justiciable por aplicar la Doctrina de Cuestión Política. No hay duda que este Tribunal ha adoptado esa doctrina de justiciabilidad. Véase Córdova y otros v. Cámara Representantes, 171 D.P.R. 789 (2007). No obstante, en el caso de autos la Doctrina de Cuestión Política no aplica, ya que no estamos revisando la facultad política de la Rama Legislativa de proponer enmiendas constitucionales, sino auscultando que los requisitos constitucionales para su proposición se hayan cumplido cabalmente. Véase Powell v. McCormack, 395 U.S. 486 (1969).

(4) En la jurisdicción federal, algunas cortes de distrito han encontrado violacio-nes a la Doctrina de Incuria en casos en los cuales se retan disposiciones electorales. Véase Knox v. Milwaukee County Bd. of Elections Com’rs, 581 F.Supp. 399 (D.E. Wis. 1984). Por su parte, el Tribunal Supremo federal también ha sido cauteloso en pro-veer remedios en casos en los cuales se cuestionan procesos electorales presentados en una fecha demasiado cercana al día del evento. Véase Williams v. Rhodes, 393 U.S. 23, 34-35 (1968).

(5) Ese término vencía el 19 de mayo de 2012 y el P.I.P. presentó la demanda de autos el 23 de mayo de 2012.

(6) Específicamente, el 27 de junio de 2012 se presentó ante este Foro un docu-mento de la C.E.E. que certifica que los gastos incurridos por esa entidad para la celebración del referéndum de 19 de agosto de 2012 ascienden a aproximadamente un millón cuatrocientos setenta y cinco mil seiscientos siete dólares con noventa y tres centavos ($1,475,607.93).

(7) A esos efectos, menciona el Prof. Larry D. Kramer que: “[t]he word ‘constitution’ had several meanings in the seventeenth and eighteenth centuries, not all of which correspond to modern understandings. According to one usage, a ‘constitution’ was simply the arrangement of existing laws and practices that, literally, constituted the government; it was neither anterior nor superior to government or ordinary law, making it possible to speak of a law being unconstitutional without it also being illegal”. L.D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review, Nueva York, Oxford University Press, 2004, págs. 9-10.

(8) Nótese que tanto la See. 2 del Art. III como la Sec. 1 del Art. VII de la Constitución, L.P.R.A., Tomo 1, utilizan el mismo verbo para establecer la composi-ción de los cuerpos. La See. 2 del Art. III, supra, ed. 2008, pág. 442, establece que “[e]l Senado se compondrá de veintisiete Senadores”, mientras que la Sec. 1 del Art. VII, supra, ed. 2008, pág. 282, establece que las Resoluciones Concurrentes que propon-gan enmiendas constitucionales deberán ser aprobadas “por no menos de dos terce-ras partes del número total de los miembros de que se compone cada cámara”. (Enfasis suplido).

(9) Estas dos (2) vacantes surgieron tras la renuncia de los senadores Roberto Arango-Vinent y Antonio Soto.

(10) Véase Alegato del Gobierno de Puerto Rico, pág. 11.

(11) Véase Apéndice de la Certificación, pág. T.S. 103.

(12) La Regla 17.1 del Senado de Puerto Rico establece que:
“Las Resoluciones Concurrentes son aquellas medidas aprobadas por ambos Cuerpos, las cuales se utilizan para:
“a) Proponer enmiendas a la Constitución de Puerto Rico;
“b) Consignar expresiones de la Asamblea Legislativa que no tienen carácter de legislación;
“c) Disponer sobre el gobierno interno de la Asamblea Legislativa”. (Énfasis suplido). Reglamento del Senado de Puerto Rico, 16ta Asamblea Legislativa, Ira Sesión Ordinaria, pág. 56.

(13) Diccionario de la Real Academia Española, disponible en http://lema.rae.es/ drae/?val=reiterar (última visita, 26 de junio de 2012).

(14) No obstante, aplicando el mismo estándar, una mayoría del Tribunal con-cluyó que la propuesta enmienda constitucional sobre los miembros del Tribunal Supremo sí perseguía un propósito único, fijar permanentemente en nueve (9) la composición de este Tribunal.

(15) Por su pertinencia y excelente rigor analítico, citamos in extenso la crítica principal del profesor:
“La falla principal del razonamiento de la mayoría ... se produjo al escoger el nivel de generalidad con que aplicaría el criterio de propósito único. A nuestro juicio, la enmienda sobre la limitación de términos tenía un propósito general único, limitar los términos de cargos electivos. Lo demás era todo incidental. Por supuesto que habría electores razonables que preferirían unas limitaciones a unos cargos y no a otros, y otros electores razonables que discreparían sobre cuáles deben ser las limi-taciones a cada cargo. Pero la gran mayoría de los electores razonables, debatirían sobre una controversia central: ¿debe o no haber en un gobierno democrático limita-ciones al número de veces que una persona puede resultar electa a determinado car-gol" (Énfasis suplido). J.J. Álvarez González y A.I. García Saúl, Derecho constitucio-nal, 65 Rev. Jur. U.P.R. 799, 871 (1996).

(16) El texto íntegro de las enmiendas constitucionales propuestas también apa-recerá en la papeleta que se le entregará a los electores.